# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WORSTEN MACK ANDREWS, <br> Plaintiff, <br> v. <br> CITY OF PITTSBURG, et al., <br> Defendants. | Case No. 17-cv-00228-JCS <br><br> **ORDER DENYING SUMMARY JUDGMENT MOTION** <br><br> Re: Dkt. No. 62 |

## I. INTRODUCTION

On November 17, 2015, a City of Pittsburgh police officer, Sgt. Michael Keefe, shot Plaintiff Worsten Andrews. Based on that incident, Andrews asserts claims against Sgt. Keefe for excessive force under 42 U.S.C. § 1983 and battery; he asserts a claim for negligence per se against the City of Pittsburgh.[1] Presently before the Court is Defendants' City of Pittsburgh and Officer Keefe's Motion for Summary and/or Partial Summary Judgment ("Motion"). A hearing on the Motion was held on Friday, June 28, 2019 at 9:30 a.m. For the reasons stated below, the Motion is DENIED.[2]

## II. BACKGROUND

### A. Factual Background

Sgt. Keefe was hired by the City of Pittsburgh Police Department ("PPD") as a police officer in 1999 and had worked for PPD for over sixteen years at the time of the incident that is the subject of this action ("Incident"), which occurred on November 17, 2015. Rothman Decl., Ex. E

---

[1] Andrews voluntarily dismissed six other claims asserted in this action. *See* Docket No. 60.
[2] The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).

("Keefe Decl.") ¶ 2. According to Sgt. Keefe, at the time of the Incident he was working as an Intelligence Officer with the Investigations Team and worked with the Neighborhood Police Team ("NPT") to locate and capture fugitives. *Id.* ¶ 6. In that capacity, he worked closely with Detectives Reddoch and Palma ("the Detectives"). *Id.* Typically, the Detectives conducted surveillance to locate the fugitive while Officer Keefe carried out the arrest. *Id.*

At 1:00 p.m. on the day of the Incident, Sgt. Keefe, Officer Buck (a Canine Handler and Field Training Officer) and the Detectives attended an operational briefing on the apprehension of Worsten Andrews, who was wanted on outstanding felony warrants. *Id.* ¶ 10; *see also* Rothman Decl., Ex. F ("Buck Decl.") ¶¶ 3, 5. Sgt. Keefe and Officer Buck were given an "operational plan packet" ("Plan") containing materials about Andrews, which they reviewed and discussed at the briefing. Keefe Decl. ¶ 10; Buck Decl., ¶ 6; *see also* Rothman Decl., Ex. G (Operational Plan Packet). The Plan describes the "mission" of the operation as follows: "To safely conduct surveillance at the listed location [555 N. Parkside Dr., Pittsburgh, CA] and apprehend (S) Worsten Andrews in the event he is seen at the residence." Rothman Decl., Ex. G. Under the heading "Special Instructions/Contingency Plan," it states that the surveillance that was planned related to an "ongoing PC 245 case."[3] *Id.* The Plan contained several pictures of Andrews. *Id.*

Under the heading "Criminal History," the Plan contained the following list of violations of the California Penal Code, California Vehicle Code and California Health and Safety Code: "PC 417(a)(2) [drawing or exhibiting a firearm in a "rude, angry, or threatening manner" or using it unlawfully "in any fight or quarrel"], PC 187 [murder], PC 215 [carjacking], PC 245(a)(2) [assault with a deadly weapon], PC 211 [robbery], PC 12021 [prohibition on possession of a firearm by convicted felon], PC 422 [criminal threats], PC29800 [prohibition on possession of firearm by individual who has an outstanding felony warrant], CVC 2800.2 [driving in willful or wanton disregard for safety of persons or property while fleeing from pursuing police officer], PC 236.1(a) [human trafficking], H&S 11377 [unauthorized possession of controlled substance]."[4]

---

[3] California Penal Code Section 245 establishes penalties for assault with a deadly weapon.
[4] Andrews addressed some of these violations at his deposition, testifying that: 1) he served a twelve-year prison sentence related to a carjacking in which the owner of the vehicle was shot and killed, resulting in a manslaughter conviction; Rothman Decl., Ex. H (Andrews Dep.) at 33-35; 2)

2

Documents attached to the Plan reflect that there was at least one active warrant for Andrews' arrest for violation of the terms of his parole, with a caution that Andrews was "Armed and Dangerous." *Id*.

At the operational briefing, Sgt. Keefe learned that Andrews was "wanted in relation to a firearm assault which had occurred weeks earlier after [Andrews] had moved into the house at 555 N. Parkside Dr. in Pittsburgh, but was asked to move out." Keefe Decl. ¶ 10(a). Keefe was told that during that incident Andrews held a loaded firearm to his roommate's head and threatened to kill him. *Id*. Keefe also learned from the Detectives that several informants had told them that Andrews always carries a gun. *Id*. ¶ 10(d); *see also* Rothman Decl., Ex. G (Andrews Dep.) at 46-47 (testifying that he always carried a loaded gun) & 63 (testifying that "the majority of the time" he slept with his gun under his pillow). In addition, Officer Keefe learned of Andrews' violent criminal history, which included felony convictions for "homicide, human trafficking, assault with a firearm, brandishing a firearm, carjacking by force or fear, robbery, being a felon in possession of a firearm, criminal threats and reckless evasion of police (in a vehicle)." Keefe Decl. ¶ 10(e). According to Sgt. Keefe, he also learned that Andrews had recently been arrested for human trafficking in another county and was found to have a handgun on him when he was arrested. *Id*. ¶ 10(f). He learned that Andrews was on parole as well as probation and was categorized as a "parolee at large." *Id.* ¶ 10(g); *see also* Buck Decl. ¶ 6 (stating that he had received the same information about Andrews at the operational briefing).

Sgt. Keefe also states in his declaration that he "independently recalled an incident that had occurred about two weeks prior, when PPD officers had gone to 555 N. Parkside Dr. to arrest [Andrews]" for the assault on his roommate and on "other outstanding warrants." Keefe Decl. ¶ 10(b). According to Sgt. Keefe, Andrews escaped arrest by showing the officers a fake id. card. *Id*.; *see also* Rothman Decl., Ex. G (Andrews Dep.) at 69-72 (testifying that police came to 555

---

while on parole after serving this sentence Andrews became a "parolee at large" as a result of violating the terms of his parole and was arrested for (and convicted of) fleeing the police in a vehicle, *id*. at 36-38; 3) Andrews was arrested for, and convicted of, being a felon in possession of a firearm at least once, *id.* at 38-39; and 4) he was arrested for threatening or assaulting another person with a firearm but the charge was pled down to criminal threats. *Id*. at 42.

3

N. Parkside about two weeks before the incident with "guns drawn" and searched the house and that Andrews showed them a fake id. because he was a "parolee at large" and would have been arrested if he had revealed his real identity).

After the operational briefing, at approximately 2:00 p.m., Sgt. Keefe, Officer Buck and the Detectives commenced the arrest "sting," with the Detectives watching the house (555 N. Parkside Dr.) in order to alert Sgt. Keefe and Officer Buck when Andrews left the residence; Sgt. Keefe and Officer Buck were positioned on nearby streets. Keefe Decl. ¶ 11-12. According to Sgt. Keefe, after he was in position he heard Detective Reddoch advise that Andrews had left the residence and was wearing a red long sleeve shirt and a tan puffy vest. *Id*. ¶ 12. About five minutes later, an individual matching this description came around the corner and approached Sgt. Keefe's vehicle, an unmarked black SUV. *Id*. ¶¶ 9, 13. Sgt. Keefe believed that the individual was Andrews. *Id.* ¶13. Sgt. Keefe was wearing his PPD uniform and equipment that clearly identified him as a PPD officer. *Id*. ¶ 8.

According to Sgt. Keefe, at this point he exited his vehicle, activated his body camera and prepared to speak to Andrews, but he stayed on the opposite side of the vehicle because he feared that Andrews was armed. *Id.* ¶ 13. Sgt. Keefe also believed that Andrews already knew there was an outstanding warrant for his arrest as PPD officers had tried to arrest him two weeks earlier. *Id.* Sgt. Keefe states in his declaration that because he was alone at this point, he used a "ruse to buy [him]self time for backup to arrive" in which he attempted to calmly converse with Andrews. *Id*. At the same time he was speaking to Andrews he called for backup. *Id.* ¶ 14. Sgt. Keefe states that when he spoke to Andrews, Andrews initially ignored him; when Andrews did stop he "looked uncomfortable and would not face [Sgt. Keefe] squarely." *Id.* ¶ 15. According to Sgt. Keefe, Andrews was also "blading" his body away from the Sgt. Keefe, bolstering the officer's belief that Andrews was trying to hide a weapon. *Id*. Sgt. Keefe states that Andrews was edging away from him as they conversed and seemed to be "readying himself to flee." *Id*. He says that he asked Andrews for identification in a further effort to stall Andrews and that Andrews handed him an id. while still "blading" his body, acting "antsy" and edging away from him. *Id*.; *see also* Buck Decl. ¶ 7 (stating that he observed Sgt. Keefe talking to Andrews and that Andrews looked

4

"extremely nervous and uncomfortable" and was avoiding eye contact). Believing that Andrews was preparing to flee, Sgt. Keefe walked around the vehicle so that it was no longer between them and he was closer to Andrews, and he instructed Andrews to "hold on, don't go anywhere." Keefe Decl. ¶ 15.

At this point, Sgt. Keefe heard Officer Buck's canine barking, alerting him that backup had arrived. *Id.* ¶ 17. Sgt. Keefe asked Andrews if he had any weapons on him and Andrews "instantly took off running." *Id.* Sgt. Keefe states that he ordered Andrews to "stop" and then "took off running" after Andrews. *Id.* ¶ 18; *see also* Buck Decl. ¶ 10 (stating that he heard Sgt. Keefe yell several times for Andrews to stop). According to Sgt. Keefe, within seconds he attempted to stop Andrews with his Taser, knowing that Andrews was likely armed and that it would be extremely dangerous to try and tackle him. *Id.* Although a taser dart attached itself to Andrews' puffy vest, it had no effect on Andrews. *Id.* Sgt. Keefe states that he also knew that although Officer Buck had arrived with a canine, the canine likely would not be used because Sgt. Keefe was between Andrews and the canine, raising the possibility that the canine would mistake Sgt. Keefe for Andrews. *Id.* ¶ 19.

Sgt. Keefe describes the seconds before he shot Andrews as follows:

> 22. When I was approximately fifteen feet away from [Andrews], I saw him reach his right hand towards the front right side of his waistband. At that time, [Andrews] turned to a gallop-type movement, a movement I have seen before when fleeing suspects have pulled weapons from their waistband area. I believed [Andrews] was reaching for his gun.
>
> 23. As he was reaching for his waistband, [Andrews changed running direction. I yelled, "He's going for his waistband!" and transferred from my Taser to my firearm, believing [Andrews] was reaching for his gun. As I started to unholster my weapon, I clearly saw a black firearm in Plaintiff's right hand. With the gun in his right hand, [Andrews] furtively moved his right shoulder back towards me, as if he was going to turn. In the moment, I believed he was attempting to turn to shoot at me or [Officer] Buck . . . . As I lifted my firearm towards [Andrews], he made another very quick and abrupt turning motion with the gun in his hand and I fired one shot at him, believing that if I did not do so, [Andrews] would have turned all the way around to face me to shoot and potentially kill or seriously injure myself or [Officer] Buck. All of this happened in a very quick time period, mere split seconds.

*Id.* ¶ 22-23; *see also* Buck Decl. ¶¶ 12-13 (stating that in the split seconds before Sgt. Keefe shot

5

Andrews, Officer Buck observed Andrews reach for his waist band and believed Andrews was reaching for a gun; and also stating that he saw Andrews pull something from his waistband and "abruptly swing his body, turning his body as though trying to face Sgt. Keefe," leading Officer Buck to conclude that Andrews was turning to shoot Sgt. Keefe and/or Officer Buck).

According to Sgt. Keefe, seeing that Andrews had been shot, and no longer observing a gun in Andrews' hand, Sgt. Keefe saw no immediate threat and did not fire any further shots. *Id.* ¶ 24. Sgt. Keefe states that he suspected that Andrews had thrown his gun towards the residence he had been shot in front of. *Id.* ¶ 25.

The body camera footage from Sgt. Keefe and Officer Buck is consistent with the accounts of the officers in some ways but not in others. In the footage, Andrews is wearing a red shirt and a tan puffy vest, but the shirt is short-sleeved rather than long-sleeved, as stated in Sgt. Keefe's declaration. Further, Andrews appears to respond promptly when Sgt. Keefe addresses him, and in the first few moments of the exchange between Sgt. Keefe and Andrews, Andrews is looking directly at the camera, apparently contradicting Sgt. Keefe's statements that Andrews initially ignored him and then refused to look at him. Consistent with Sgt. Keefe's account, Sgt. Keefe can be heard in the body camera footage asking, "do you have any weapons on you dude" at 2:01 and Andrews can be seen turning away within a split second, and then starting to run. Sgt. Keefe can then be heard to say, "hold on bro" but it is not clear from the body camera footage what further commands (if any) Sgt. Keefe made while he was pursuing Andrews. Although some yelling can be heard, it is unintelligible. Thus, the footage does not clearly confirm or contradict the statements of the officers that Sgt. Keefe ordered Andrews to "stop" or yelled that "he's going for his waistband."

Similarly, the body camera footage does not clearly support or contradict Sgt. Keefe's statement that he shot Andrews just after Andrews pulled out his gun and seemed to be turning. There is no doubt that Andrews can be seen in the footage bending his right arm towards his right hip area as he flees and there is at least one frame of the footage in which an object that looks like a gun can be seen in Andrews' right hand, at 2:08. *See* Rothman Decl., Ex. K (screenshot from Sgt. Keefe's body camera footage at 2:08). It is unclear, however, at what point Andrews actually

threw the gun and how many seconds elapsed before Sgt. Keefe shot Andrews. The body camera footage is jerky and the officer was running with the sun in front of him, with the result that Andrews is sometimes in silhouette and his image is difficult to make out at some points. His right hand, in which he had been holding a gun, cannot always be seen. Nor is the gunshot audible and it is not obvious that Andrews has been shot until 2:12 on the body camera footage (though a jury could reasonably conclude that he was shot before that). Drawing all reasonable inferences in favor of Andrews, and having viewed the body camera footage many times, the Court concludes that a reasonable jury could find, as a matter of fact, that Sgt. Keefe shot Andrews up to four seconds after Andrews had thrown away the gun. The Court further concludes that the movements that Sgt. Keefe described as "furtive" may or may not be found by a jury viewing the body camera footage to be movements that a reasonable officer would perceive to be threatening.

In his deposition, Andrews testified that at the time Sgt. Keefe stopped him, he was carrying a loaded gun in a holster under his clothing, on his right hip. Rothman Decl., Ex. H (Andrews Dep.) at 66-67. He also testified that he fled from Sgt. Keefe because he was a parolee at large at the time of the Incident and because he had "contraband" in his pockets. *Id.* at 72-75. Andrews confirmed that he was aware at the time of the Incident that there was a warrant out for his arrest. *Id.* at 71. Andrews testified that while he was running, he threw his gun and other items that were in his pockets away from him; he said that he threw his gun over his left shoulder because he wanted to throw it over a gate and towards a house rather than into the street, which was to his right. *Id.* at 68.

Andrews reviewed Officer Keefe's body camera footage during his deposition and identified the object in his hand at 2:08 of the footage as his pistol. *Id.* at 90. He testified that the body camera footage shows that a split second earlier his right arm was bent and that he could have been reaching for his gun or for his pockets, though he didn't specifically remember making these movements and wasn't sure if he was reaching for his gun. *Id.* at 88-90. He also testified that once he had removed the gun from its holster he can be seen in the footage twisting to the left as he moved to throw the gun over the fence and into an adjacent yard. *Id.* at 90. According to Andrews, when he turned slightly to throw his gun, he was turning *away* from Sgt. Keefe. *Id.* at

7

144. He testified that he thought he was shot at 2:10 on Sgt. Keefe's body camera footage but then testified that he was "not sure," saying "I don't believe he even shot me yet." *Id*. at 98. Andrews testified that he never heard Sgt. Keefe say "stop" to him. *Id*. at 87-88. He also testified that he did not hear Sgt. Keefe give any commands as he fled and that he didn't know Sgt. Keefe was still behind him, testifying, "that's why I stopped." *Id*. at 75.

Andrews' gun was later retrieved from the side yard of the house he was shot in front of. *See* Rothman Decl., Ex. N (pictures of gun that was found in side yard); *see also* Rothman Decl., Ex. H (Andrews Dep.) at 147-148 ( testifying based on pictures in Exhibit N that the gun that was found in the side yard was his).

### B. Contentions of the Parties

Defendants seek summary judgment on all three of Andrews' remaining claims. With respect to the excessive force and battery claims, which are asserted against Sgt. Keefe only, they argue that these claims should be dismissed because the undisputed facts establish that the amount of force Sgt. Keefe used was reasonable. They further contend that Sgt. Keefe is entitled to qualified immunity because there is no clearly established law that would have put a reasonable officer on notice that the force used by Sgt. Keefe was unlawful. Defendants also contend the negligence per se claim, asserted only against the City of Pittsburgh, should be dismissed – both because Andrews has not established that Sgt. Keefe acted unreasonably and because he has not properly alleged respondeat superior liability under California Government Code section 815.2.

Andrews asserts that there are material disputes of fact as to whether the use of force was reasonable and therefore, that summary judgment should be denied on all three claims. He also argues that these factual disputes preclude summary judgment on the question of qualified immunity. He does not address Defendants' contention that the negligence per se claim also fails because he has not properly alleged respondeat superior liability but at oral argument his counsel did not dispute that Andrews has already dropped this claim to the extent it is based on negligent training based on his dismissal of his *Monell* claim.

## III. ANALYSIS

### A. Legal Standards Governing Summary Judgment Under Rule 56

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to designate "'specific facts showing there is a genuine issue for trial.'" *Id*. (citation omitted); *see also* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ."). "[T]he inquiry involved in a ruling on a motion for summary judgment . . . implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 252 (1986). The non-moving party has the burden of identifying, with reasonable particularity, the evidence that precludes summary judgment. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). Thus, it is not the task of the court to scour the record in search of a genuine issue of triable fact. *Id.*; *see Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001); Fed. R. Civ. P. 56(c)(3).

A party need not present evidence to support or oppose a motion for summary judgment in a *form* that would be admissible at trial, but the *contents* of the parties' evidence must be amenable to presentation in an admissible form. *See Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003). Neither conclusory, speculative testimony in affidavits nor arguments in moving papers are sufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.,* 594 F.2d 730, 738 (9th Cir. 1979). On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant, *Scott v. Harris*, 550 U.S. 372, 378 (2007), but where a rational trier of fact could not find for the non-moving party based on the record as a whole, there is no "genuine issue for trial" and summary judgment is appropriate.

*Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

### B. The Excessive Force Claim

#### 1. Legal Standards Governing Excessive Force Claims under 42 U.S.C. § 1983 and the Fourth Amendment

Section 1983 provides "a method for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393-94 (1989) (citation omitted)). Thus, analysis of a civil rights claim brought under § 1983 begins with the identification of the "specific constitutional right allegedly infringed by the challenged application of force." *Id*. at 394 (citation omitted). The claim is then evaluated under the constitutional standards that apply to that constitutional right. *Id*. (citing *Tennessee v. Garner*, 471 U.S. 1, 7–22 (1985)).

Andrews asserts that Defendants' use of excessive force resulted in an unreasonable seizure under the Fourth Amendment. This claim is analyzed under the Fourth Amendment's "objective reasonableness" standard. *Arpin v. Santa Clara Valley Transportation Agency*, 261 F.3d 912, 921 (9th Cir. 2001). In particular, courts ask "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Graham*, 490 U.S. at 397. "This inquiry 'requires a careful balancing of "the nature and quality of the intrusion on the individual's Fourth Amendment interests" against the countervailing governmental interests at stake.'" *Glenn v. Washington Cty.*, 673 F.3d 864, 871 (9th Cir. 2011) (quoting *Graham*, 490 U.S. at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985))). Thus, courts first consider the quantum of force used and then balance that against the government's interest in the use of force. *Id*. at 876.

"The strength of the government's interest in the force used is evaluated by examining three primary factors: (1) 'whether the suspect poses an immediate threat to the safety of the officers or others,' (2) 'the severity of the crime at issue,' and (3) 'whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Id*. at 872 (quoting *Graham*, 490 U.S. at 396). Of these factors, the Ninth Circuit has held that the most important is "whether the suspect poses an immediate threat to the safety of the officers or others." *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994). Determining whether the force used was reasonable "requires careful attention to the

facts and circumstances of each particular case." *Graham*, 490 U.S. at 396. "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id*.

"Because [the excessive force inquiry] nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, [the Ninth Circuit has] held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Smith v. City of Hemet*, 394 F.3d at 701 (quoting *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002)).

### 2. Whether Defendants Are Entitled to Summary Judgment on the Excessive Force Claim

While a close call, the Court concludes that there are fact questions as to the reasonableness of the force used that preclude summary judgment on Andrews' excessive force claim.

The Court's inquiry begins with an analysis of the intrusiveness of the force that was used against Andrews. There can be no dispute that the single gunshot deployed by Sgt. Keefe was deadly force, even though it did not, in fact, kill Andrews. *Blanford v. Sacramento County*, 406 F.3d 1110, 1115 n. 9 (9th Cir.2005) (shooting at a suspect is the use of deadly force); *see also Fernandez v. McKnight,* No. 1:12-CV-557-BAM, 2014 WL 352238, at *6 (E.D. Cal. Jan. 31, 2014) (officer used deadly force by firing a single shot at plaintiff). The Ninth Circuit has explained that "[a]ll claims of excessive force, whether deadly or not, are analyzed under the objective reasonableness standard of the Fourth Amendment" but that the Supreme Court in *Tennessee v. Garner* articulated a more "particularized version" of the test for cases involving uses of deadly force. *Blanford*, 406 F.3d at 1115. In *Tennessee v. Garner*, "[t]he Court explained that while it is unreasonable to apprehend an unarmed, nondangerous suspect by killing him, an officer's use of deadly force to prevent escape satisfies Fourth Amendment standards '[w]here the

11

officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others.'" *Id. (*quoting *Tennessee v. Garner*, 471 U.S. at 11); *see also Price v. Sery*, 513 F.3d 962, 969 (9th Cir. 2008) ("to justify deadly force, an objective belief that an imminent threat of death or serious physical harm is required."). With this test in mind, the Court examines the government's interests in the use of force under the specific facts of this case.

As discussed above, the three key factors courts consider in evaluating the government's interest in the use of force are whether the suspect poses an immediate threat to the safety of the officers or others, the severity of the crime at issue, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight. It is undisputed that Andrews was attempting to evade arrest by flight. Andrews admitted that he ran to escape arrest, both because he was a parolee at large and because he was carrying contraband in his pocket. Moreover, Defendants have offered uncontroverted evidence that there was at least one active warrant for Andrews' arrest at the time of the Incident. In addition, the undisputed evidence establishes that Sgt. Keefe had reason to believe that Andrews knew that there was an outstanding warrant for his arrest and that Andrews did, in fact, know this. In sum, the uncontroverted evidence establishes that Andrews was fleeing to avoid arrest at the time that force was used.

Next, the Court addresses the severity of the crime at issue. Andrews argues in his Opposition that this factor supports his argument that the force used upon him was unreasonable because the PPD officers were not attempting to arrest him for a violent crime but merely for a parole violation. *See* Opposition at 6-7. To the extent that Sgt. Keefe's use of force was based on Andrews' alleged assault on his roommate a few weeks prior, Andrews contends, it was not reasonable for the officer to take as true the allegations of Plaintiff's roommate as to those events and therefore, that alleged crime did not justify the use of deadly force. *Id*. The Court need not decide this question, though, because the parole violation was itself a serious crime when considered in light of the specific facts of this case. In particular, the underlying crime for which Andrews was on parole was for fleeing police in a vehicle while violating parole on his earlier conviction for carjacking and manslaughter. *See* Rothman Decl., Ex. H (Andrews Dep.) at 36-39. The Court therefore concludes that this factor points towards a finding of reasonableness.

The most important factor, however, is whether Sgt. Keefe reasonably believed at the time he shot Andrews that Andrews posed an imminent threat of death or serious bodily harm to the officers or others. *See Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010). On this key question, the Court concludes that there are material disputes of fact that must be decided by a jury.

The Ninth Circuit has cautioned that in deadly force cases, "[t]he judge must carefully examine all the evidence in the record . . . to determine whether the officer's story is internally consistent and consistent with other known facts." *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994). Such caution is necessary because often the officers are the only surviving eyewitnesses. *Id.* Further, the mere fact that a suspect is carrying a gun is not enough to demonstrate a reasonable belief that the suspect posed an imminent threat of death or serious bodily harm. *See George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013) ("the fact that the suspect was armed with a deadly weapon does not render the officers' response per se reasonable under the Fourth Amendment.") (internal quotations and citation omitted). Rather, there must be some specific circumstances that make it reasonable for the officers to believe that the suspect poses an imminent threat. In *George*, the court explained:

> This is not to say that the Fourth Amendment always requires officers to delay their fire until a suspect turns his weapon on them. If the person is armed—or reasonably suspected of being armed—a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat.

*Id*.

Nonetheless, if there are disputed facts relating to whether the suspect acted in a threatening manner and a jury could reasonably believe that he did not, summary judgment in favor of the officer is not appropriate. Thus, in *George* the Ninth Circuit affirmed the district court's denial of summary judgment where there was expert testimony that cast doubt on the officers' statements that the suspect, who was admittedly holding a gun and facing the officers, had pointed it at them. *Id*. at 833, 838; *see also Cruz v. City of Anaheim*, 765 F.3d 1076, 1078 (9th Cir. 2014) (stating in dicta that "[i]t would be unquestionably reasonable for police to shoot a suspect in Cruz's position if he reaches for a gun in his waistband, or even if he reaches there for

13

some other reason" but reversing district court's grant of summary judgment in favor of defendant officers because a jury could reasonably conclude that the officers' account was not credible); *S.T. by & through Niblett v. City of Ceres*, 327 F. Supp. 3d 1261, 1276 (E.D. Cal. 2018) ("This critical dispute – whether the Decedent actually was turned and pointing an object at the officers or whether he was only running away hunched over – is sufficient to deny summary judgment."); *Kosakoff v. City of San Diego,* No. 08-CV-1819UEGNLS, 2010 WL 1759455, at *9 (S.D. Cal. Apr. 29, 2010), *aff'd in part sub nom. Estate of Kosakoff ex rel. Kosakoff v. City of San Diego*, 460 F. App'x 652 (9th Cir. 2011) (denying summary judgment on an excessive force claim based, in part, on the fact that there was "a dispute as to what verbal commands were given to him by the officers and whether those commands could be heard over all the commotion.").

Here, Defendants point out that it is undisputed that Andrews reached for his gun as he ran. There are, however, disputed facts that are relevant to whether Sgt. Keefe reasonably believed Andrews posed an imminent threat. As discussed above, the body camera footage is jerky and the position of the sun makes it hard to discern what is happening at times; Andrews is sometimes in silhouette or not visible and his hands are sometimes out of sight; the yelling in the background is unintelligible and no gunshot can be heard; it is not clear exactly when Andrews threw the gun or when he was shot. Based on the evidence in the record, a jury could reasonably conclude that Andrews did not make any furtive or threatening gesture, or that he was shot several seconds after he had already thrown the gun away, leading it to find that the force used by Sgt. Keefe was excessive.

Because the Court finds that there are disputes of fact that are material to whether Sgt. Keefe reasonably believed that Andrews posed an imminent threat of death or serious harm at the time he shot Andrews, the Court denies summary judgment on this claim.

### 3. Whether Sgt. Keefe is Entitled to Qualified Immunity

#### a. Legal Standards Governing Qualified Immunity

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231

14

(2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity provides government officials with "immunity from suit rather than a mere defense to liability." *Pearson*, 555 U.S. at 231 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis deleted)). The rule attempts to balance competing interests – those of plaintiffs who have been wronged by government officials, and those of government officials who may be inhibited in performance of their duties out of fear of financial liability and time-consuming litigation. *Anderson v. Creighton*, 483 U.S. 635, 638 (1987).

To determine if an official is protected by qualified immunity, a court asks (1) whether the plaintiff's constitutional right has been violated; and (2) whether that right was clearly established at the time of the challenged conduct. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). In *Saucier*, the Supreme Court held that the qualified immunity analysis required that the district court first determine whether there was a violation of the plaintiff's constitutional rights and that only if such a violation was found should it proceed to the question of whether the violation involved a clearly established right. 533 U.S. at 201. In *Pearson*, however, the Court modified this rule, holding that the qualified immunity analysis need not be done in any particular order. 555 U.S. at 236. The Court reasoned that while the approach required under *Saucier*'s mandate may have a beneficial effect on the development of precedent, "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." *Id*. at 237. Therefore, the Court concluded, a more flexible approach is warranted and will permit the lower courts to "determine the order of decision making that will best facilitate the fair and efficient disposition of each case." *Id*. at 242.

The inquiry as to whether a constitutional right is clearly established is "particularized." *Saucier*, 533 U.S. at 201. It is not enough that the general rule is established. *Id*. Rather, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id*. at 202 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Although the existence of a clearly established constitutional right is usually demonstrated on the basis of cases involving similar facts where the alleged conduct has been found to be unconstitutional, "[w]hen the defendant's conduct is so patently violative of the

15

constitutional right that reasonable officials would know without guidance from the courts that the action was unconstitutional, closely analogous pre-existing case law is not required to show that the law is clearly established." *Deorle v. Rutherford*, 272 F.3d 1272, 1285-1286 (9th Cir. 2001) (quotation and citation omitted). The Supreme Court has cautioned that courts should afford "deference to the judgment of reasonable officers on the scene" and should not use "20/20 hindsight vision." *Saucier*, 533 U.S. at 205. However, "[w]here the facts are disputed, their resolution and determinations of credibility 'are manifestly the province of a jury.'" *Wall v. Cty. of Orange*, 364 F.3d 1107, 1110 (9th Cir. 2004) (quoting *Santos v. Gates*, 287 F.3d 846, 852 (9th Cir. 2002)).

b. Discussion

Here, the Court has found that there is a fact question as to whether the Sgt. Keefe violated Andrews' Fourth Amendment right to be free from excessive force. Therefore, Sgt. Keefe is entitled to qualified immunity at this stage of the case only if the Court finds that even assuming he used excessive force, he did so based on a reasonable, though mistaken, belief that under established case law, his conduct was reasonable. As discussed above, on summary judgment the Court relies on undisputed facts and where facts are disputed, the Court must draw all reasonable inferences in favor of the party opposing summary judgment. Depending upon what the jury finds transpired just before Andrews was shot, and drawing all reasonable inferences in Plaintiff's favor, the jury could find that Sgt. Keefe shot Andrews three or four seconds after he had thrown away his gun, that he was not given any commands before he was shot, and/or that he did not turn towards Sgt. Keefe or make any furtive movements just before he was shot. A reasonable officer would have known under the preexisting case law that shooting an unarmed individual who posed no threat constituted excessive force under the Fourth Amendment. *See Tennessee v. Garner*, 471 U.S. at 10 ("A police officer may not seize an unarmed, nondangerous suspect by shooting him dead."). Therefore, summary judgment on the question of qualified immunity is not warranted.

**C.  The Battery Claim**

The tort of battery under California law is governed by the same reasonableness standards as claims for excessive force asserted under 42 U.S.C. § 1983 and the Fourth Amendment.

16

*Sanders v. City of Fresno*, 551 F. Supp. 2d 1149, 1179 (E.D. Cal. 2008), aff'd, 340 F. App'x 377 (9th Cir. 2009). Because the same standards apply to Andrews' battery and Section 1983 claims, the Court concludes that there are material disputes of fact that preclude summary judgment on the battery claim for the reasons discussed above.[5]

**D.     The Negligence Per Se Claim**

Defendants assert that they are entitled to summary judgment on the negligence per se claim asserted against the City of Pittsburgh.  First, they argue that the negligence claim requires Andrews to demonstrate that the conduct of Sgt. Keefe was unreasonable and that he cannot do so for the same reasons his claims for excessive force and battery fail.  Because the Court has found that there are material disputes of fact with respect to the reasonableness of the force used, the Court declines to enter summary judgment on that ground.

Second, Defendants contend the negligence per se claim does not properly allege respondeat superior liability under Cal. Gov't Code section 815.2, instead alleging that the City of Pittsburgh is liable for "negligence in the proper training of its officers, which resulted in injury to plaintiff." *See* Complaint ¶ 64.  Defendants argue that this is "a *Monell* type allegation" and Andrews has already dismissed his *Monell* claim.  Motion at 24-25.  At oral argument, Plaintiff did not dispute that this claim has already been dismiss to the extent it is based on a theory of negligent training.  Andrews seeks to go forward with this claim on a theory of respondeat superior, however.  As Defendants have not pointed to any prejudice that would result from

---

[5] Defendants also cite Penal Code section 835a in support of their request for summary judgment on Andrews' battery claim.  Section 835a provides:

> Any peace officer who has reasonable cause to believe that the person to be arrested has committed a public offense may use reasonable force to effect the arrest, to prevent escape or to overcome resistance.
>
> A peace officer who makes or attempts to make an arrest need not retreat or desist from his efforts by reason of the resistance or threatened resistance of the person being arrested; nor shall such officer be deemed an aggressor or lose his right to self-defense by the use of reasonable force to effect the arrest or to prevent escape or to overcome resistance.

Cal. Pen. Code § 835a.  Defendants do not, however, cite any case law suggesting that the "reasonable force" standard under this provision deviates from the reasonableness standards that govern the Fourth Amendment excessive force inquiry. .

17

allowing Plaintiff to go forward on a theory of respondeat superior on this claim, the Court deems Plaintiff's negligence per se claim to be amended to allege that the City of Pittsburgh is liable for negligence per se on the basis of respondeat superior liability.

## IV. CONCLUSION

For the reasons stated above, the Motion is DENIED.   A Final Pretrial Conference will be held on **September 20, 2019, at 2:00 p.m**., as stated in the Court's May 7, 2018 Case Management and Pretrial Order (Jury), Dkt. No. 31.  The parties are reminded to review the Trial Procedures section of that Order in preparation for the Final Pretrial Conference.

**IT IS SO ORDERED.**

Dated:  July 3, 2019

JOSEPH C. SPERO
Chief Magistrate Judge